James **BROWN**, Plaintiff,

v.

Daniel G. **MIDDAUGH**, Individually and as Sheriff of Oneida County, New York; M. Peter Paravati, Individually and as Undersheriff of Oneida County, New York; Lt. Roy Meyers, Individually and as an employee of the Sheriff's Department of Oneida County, New York; Lt. William Chappell, Individually and as an employee of the Sheriff's Department of Oneida County, New York; Sgt. Meyers, Individually and as an employee of the Sheriff's Department of Oneida County; Sgt. Gregory Hughes, Individually and as an employee of the Sheriff's Department of Oneida County, New York; Fred Lamado, Individually and as a Deputy Sheriff/Corrections Officer of the County of Oneida, New York; Nick White, Individually and as a Deputy Sheriff/Corrections Officer of the County of Oneida, New York; Joseph Lisi, Individually and as an Investigator for the Sheriff's Department of Oneida County, New York; John Doe, a fictitious name intended to represent the names of several employees of the Sheriff's Department of Oneida County, New York and/or the County of Oneida, New York, whose identities are as yet unknown; County

of Oneida, New York, Defendants.[1]

No. 96–CV–1097.

United States District Court,
N.D. New York.

Feb. 19, 1999.

1. As the court has noted previously, although the caption names "Lt. Roy Meyers" and "Sgt. Meyers" as defendants, in reality these names represent the same defendant, Roy Meyers. Moreover, the caption misspells two defendants names: "Chappell" should read "Chapple" and "Lamado" should read "Lamanto."

A.J. Bosman–Moore, Office of A.J. Bosman–Moore, Rome, New York, for plaintiff.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, New York (James A. O'Shea, of Counsel) for defendant Oneida County.

Carl Cochi, Offices of Carl Cochi, Utica, New York, for defendant Paravati.

Gorman, Waszkiewicz, Gorman & Schmitt, Utica, New York (Bartle J. Gorman, of Counsel), for defendant Lisi.

Capecelatro, Del Buono & Compson, P.C., Utica, New York (David R. Diodati, of Counsel), for defendants Middaugh, Meyers, Chapple, Hughes, Lamanto and White.

## MEMORANDUM–DECISION and ORDER

MUNSON, Senior District Judge.

Currently before the court are defendants' motions for summary judgment, which plaintiff opposes, as well as plaintiff's cross-motion to supplement his complaint, which defendants oppose. Following oral argument on February 12, 1999, the court reserved decision on these motions. Having examined their merits carefully, the court denies plaintiff's motion to supplement his complaint; grants defendants Middaugh, Meyers, Chapple, Hughes, Lamanto, White and Lisi's motions for summary judgment; and grants in part and denies in part defendant Paravati and Oneida County's motions for summary judgment.

## BACKGROUND

Some familiarity with the background of this Memorandum–Decision and Order is assumed. Plaintiff, a black deputy with the Oneida County Sheriff's Department ("OCSD"), has been employed as a corrections officer at the Oneida County Jail since 1990. He currently is suspended from the OCSD, with pay, purportedly pending the outcome of charges filed in May 1998 for driving while intoxicated and endangering the welfare of a minor. Previously, the court denied plaintiff's motion for a preliminary injunction to lift his suspension. *See Brown v. Middaugh*, No. 96–CV–1097, 1998 WL 566791 (N.D.N.Y. Sep.3, 1998). His instant action is filed pursuant to Title VII of the Civil Rights Law of 1964 ("Title VII"), 42 U.S.C. §§ 1981–83, 85–86, New York Executive

Law § 296 (the New York Human Rights Law, or "NYHRL") and sundry state common law tort claims. It alleges defendants Oneida County, Sheriff Daniel Middaugh and Undersheriff Peter Paravati, as well OCSD deputies Roy Meyers, William Chapple, Gregory Hughes, Fred Lamanto and Nick White, and OCSD investigator Joseph Lisi, systematically have discriminated, conspired and retaliated against him on the basis of his race.

Specifically, plaintiff submits defendants have not only subjected him to a hostile work environment, but also to various forms of unlawful disparate treatment: retaliation; discriminatory application of OCSD's rules regarding sick time; unfair discipline for tardiness; denial of promotion; discriminatory job task assignments, discipline, and investigation; and unfair job performance evaluations.

Plaintiff also maintains various constitutionally-based causes of action. On July 6, 1995 he was arrested on a charge of possession of a forged instrument in violation of § 170.25 of the New York Penal Code. Roughly four months later, on December 7, 1995, a grand jury issued him a "no bill" on the charge. His arrest, he apprises the court, ran afoul of the Fourth Amendment right because it lacked probable cause. He also insists the motive actuating his attempted prosecution was race, making the action violative of the Fourteenth Amendment's Equal Protection Clause. On February 9, 1996, plaintiff discovered he was the target of an Article 75 proceeding, a civil service disciplinary mechanism with potentially punitive employment consequences. Given the timing of the proceeding, which followed his January 6, 1996 filing of a notice of claim against Oneida County and the OCSD, he contends it was instigated in retaliation for his decision to pursue legal action. Plaintiff further states his Fourteenth Amendment right to due process was violated upon the institution of the Article 75 proceeding, impairing his interest in his good name, reputation, honor and integrity. Oneida County, he submits, sanctions these actions, as it pursues an unconstitutional *de facto* policy of punishing, retaliating and discriminating against minority members of the OCSD in the terms, privileges and conditions of their employment.

Finally, in addition to his state common law tort claims, which the court addresses *supra*, plaintiff asserts defendants violated 42 U.S.C. §§ 1981–82 and 1985–86 by discriminating and conspiring against him on account of race. Defendants deny these and the other charges plaintiff makes, which the court addresses *seriatim*.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See id.; United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) *(per curiam )*. If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See Id.* at 250–251, 106 S.Ct. at 2511.

Courts have long recognized problems unique to the issue of whether to grant summary judgment against Title VII claims, such as those plaintiff raises here. "Because direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (*quoting Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994)). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.* (*citing Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)).

## II. Plaintiff's Motion to Supplement His Complaint

Plaintiff moves the court to permit him to supplement his complaint, which already has been amended once. Defendants oppose plaintiff's motion, noting: (1) it was filed on January 29, 1999; and (2) Magistrate Judge Hurd's Order dated October 20, 1998 clearly set November 13, 1998 as the date by which all pleadings must be amended, and January 15, 1999 as the date by which all motions must be filed. The court concurs with defendants: plaintiff's motion to supplement—which, in reality, is really a motion to amend his complaint for a second time—is not timely and must be denied.[2]

The court turns to the merits of the remaining motions.

2. Of course, even if plaintiff's motion was timely, it very likely would run afoul of the proscriptions set forth in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962) (factors such as undue delay and undue prejudice to opposing party by virtue of allowance of amendment may prohibit amendment). Courts also are cautious about abusing amendment where it is sought on the eve of trial and would result in new problems

## III. Defendant Lamanto's Motion for Summary Judgment

Plaintiff concedes defendant Lamanto's summary judgment motion should be granted. *See* Aff. in Opposition to Dfts' Sum. Judgment Mots., ¶ 33. The court obliges and grants Lamanto's motion.

## IV. Plaintiff's Title VII and NYHRL Claims

Title VII prohibits "employers" from undertaking certain discriminatory practices. An "employer," as defined by the act, is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such person[.]" 42 U.S.C. § 2000e(a). Although this language appears to allow individual liability under Title VII, courts have found it does not. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241, n. 2 (2d Cir.1995) ("supervisory personnel may not be held individually liable under Title VII"). *See also U.S. Equal Employment Opportunity Comm'n v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1282 (7th Cir.1995) ("and any agent" language meant "to ensure that courts would impose *respondeat superior* liability upon employers for the acts of their agents"). Accordingly, the individual Title VII claims against Middaugh, Paravati, Meyers, Chapple, Hughes, White and Lisi are dismissed. Certain Title VII claims against Oneida County, addressed *supra,* are not.[3]

of proof. *See Bradick v. Israel,* 377 F.2d 262 (2d Cir.), *cert. denied,* 389 U.S. 858, 88 S.Ct. 101, 19 L.Ed.2d 124 (1967) (court may deny amendment sought on eve of trial that presents new problems of proof).

3. Although none of the parties raise the issue, there appears to be a question of whether in addition to naming Oneida County as a defendant, plaintiff should have named the OCSD

As to plaintiff's NYHRL claim, Executive Law § 296(1)(a) provides, in pertinent part:

It shall be an unlawful discriminatory practice: (a) for an employer ... because of the ... race ... of any individual ... to discriminate against such individual in ... in terms, conditions or privileges of employment.

N.Y.Exec.Law § 296(1)(a) (McKinney 1993). Construing the term "employer," the New York State Court of Appeals held in *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984), that an individual employee cannot be liable under the NYHRL "if he isn't shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich*, 483 N.Y.S.2d at 660,473 N.E.2d 11. Meyers, Chapple, Hughes, White and Lisi cannot be liable under this provision because plaintiff has not demonstrated they are "employers" within the meaning of the NYHRL, but Oneida County—and probably Middaugh and Paravati, who as sheriff and undersheriff seemingly would have the power to carry out personnel decisions—potentially may be held liable under this statute.[4]

■ This distinction may be without a difference, however. In a different provision, the NYHRL mandates:

It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

as a defendant to proceed on a theory of Title VII liability; that is, it appears the OCSD is more properly plaintiff's employer rather than Oneida County. However, because the County has not made an issue of this matter, and because one could argue the County would be responsible through *respondeat superior* should the OCSD be held liable under plaintiff's Title VII claims, the court will treat Oneida County as plaintiff's employer for the purposes of potential Title VII liability.

4. In examining whether a defendant is an "employer" under the NYHRL, most courts interpreting this language look primarily to

N.Y.Exec.Law § 296(6) (McKinney 1993). The Second Circuit has interpreted § 296(6) to impose personal liability on any employee "who actually participates in the conduct giving rise to a discrimination claim." *Tomka*, 66 F.3d at 1317. Although Meyers, Chapple, Hughes, White and Lisi could not be held liable under § 296(1)(a), as aiders and abettors they potentially could face liability under § 296(6)—as might Middaugh and Paravati.

A claim under the NYHRL and under Title VII are essentially identical because "New York courts require the same standard of proof for claims brought under the [NYHRL] as those brought under Title VII." *Id.*, 66 F.3d at 1304 n. 4 (*citing Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985)). *See also Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993) (plaintiffs claim under NYHRL "is governed by the same standards as his federal claim"). By examining his Title VII claims, the court necessarily addresses plaintiff's NYHRL allegations.

Title VII prohibits discrimination on the basis of race and sex with respect to the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). Plaintiff raises two race-based Title VII claims: (1) he has been subject to disparate treatment; and (2) he has been subject to a hostile work environment. Aside from repudiating these claims, de-

whether the defendant has the power to hire and fire: *e.g.*, the ultimate personnel decision. *See Tomka*, 66 F.3d at 1317 (district manager had supervisory control over plaintiff and could review and comment on her performance, but could not hire or fire and therefore was not "employer" under NYHRL). *See also Cerrato v. Durham*, 941 F.Supp. 388, 396 (S.D.N.Y.1996) (considering whether defendant had power to: (1) review plaintiff's performance; (2) hire or fire anyone; and (3) make recommendations which would affect plaintiff's employment status).

fendants counter that almost all of the alleged incidents comprising his Title VII claims are time-barred.

In states such as New York, where an agency first reviews charges of employment discrimination, claims of harassment must be brought within 300 days of the "alleged unlawful employment practice"; that is, a Title VII claim is time-barred if a plaintiff fails to file a timely charge of discrimination with the EEOC. The statute reads:

> [I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief ... such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice.

42 U.S.C. § 2000e–5(e)(1). Incidents of discrimination occurring during the 300 days immediately prior to the filing of the EEOC charge usually are the only acts admissible under § 2000e–5(e)(1).

■■■■ There is a possible reprieve from the 300· day statute of limitations: under limited circumstances, courts in this circuit recognize a "continuing violation exception" to the Title VII time-bar rule. "[I]f a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993). Application of the continuing exception violation is rare. "[C]ourts in this circuit consistently have looked unfavorably on continuing violation arguments ... [and] only 'compelling circumstances' will warrant application of the exception to the statute of limitations." *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y.1989). The continuing

violation exception typically will "appl[y] to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists ... or discriminatory employment tests," *Lambert*, 10 F.3d at 53; and multiple incidents of discrimination, even similar ones not the result of a discriminatory policy or mechanism, will not amount to a continuing violation. *See id.* A continuing violation "may not be based on the continuing effects of an earlier discrimination ... or on a completed act of discrimination." *Blesedell*, 708 F.Supp. at 1414.

■■ A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994). If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time-barred. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996).

Although the Second Circuit has yet to articulate what constitutes "specific and related instances of discrimination," many district courts in this circuit have adopted the Fifth Circuit's test, which it expounded in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir. 1983). *See, e.g., Detrick v. H & E Machinery, Inc.*, 934 F.Supp. 63, 67 (S.D.N.Y. 1996); *Rivera v. Puerto Rican Home Attendants Services, Inc.*, 930 F.Supp. 124, 130 (S.D.N.Y.1996); *Dixit v. City of New York Dep't. of General Serv.*, 972 F.Supp. 730, 736 (S.D.N.Y.1997); *Morris v. Amalgamated Lithographers of America, Local One*, 994 F.Supp. 161, 165 (S.D.N.Y.1998).[5]

---

**5.** Other circuits have found *Berry* persuasive as well. *See West v. Philadelphia Electric Co.*, 45 F.3d 744, 754 n. 9 (3d Cir.1995) (adopting

*Berry* test); *Mascheroni v. Board of Regents of the University of California*, 28 F.3d 1554, 1561 (10th Cir.1994) (same); *Selan v. Kiley*,

In *Berry*, the Fifth Circuit, in determining whether specific and related discriminatory acts amount to a discriminatory practice, looked to three distinct issues:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry*, 715 F.2d at 981. Under *Berry*'s reasoning, the continuing violations doctrine applies if: (1) the allegedly discriminatory acts within and without the limitation period are sufficiently similar and frequent enough to constitute a single discriminatory practice chargeable to the employer; and (2) the circumstances are such that a plaintiff was not bound to have sued earlier. *See McKenney v. New York City Off–Track Betting Corp.*, 903 F.Supp. 619, 622 (S.D.N.Y.1995).

Courts have drawn a distinction in applying *Berry* between cases involving a continuous pattern of discrimination and a single act that should cause a plaintiff to assert his rights. *See Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir.1989). Harassment that creates a hostile work environment, as plaintiff alleges here, will not have the same degree of permanence as a single discriminatory incident—such as termination or the loss of a promotion—which seemingly would alert

an employee to assert his rights or lose them. *See West*, 45 F.3d at 756.

■ Indeed, as district courts in this circuit have noted, "[b]y its nature, a claim of 'hostile environment' discrimination turns on the existence of a continuing violation, rather than on any individual offensive act." *Engelmann v. National Broadcasting Co.*, No. 94 Civ. 5616, 1996 WL 76107, at *15 (S.D.N.Y. Feb.22, 1996). *See also Wise v. New York City Police Dep't*, 928 F.Supp. 355, 366–67 (S.D.N.Y.1996) (reasoning the same); *McKenney*, 903 F.Supp. at 621–22 (applying exception to claim involving an alleged pattern of sexual harassment); *Johnson v. Nyack Hosp.*, 891 F.Supp. 155, 166 (S.D.N.Y.1995), *aff'd*, 86 F.3d 8 (2d Cir.1996) (noting hostile environment cases "frequently" may raise issue of applicability of doctrine); *Cornwell*, 23 F.3d at 704 (continuing violation finding was supported by "the same evidence that established [plaintiff's] hostile-work environment claim"). There is a caveat: mere incantation of claims of hostile work environment will not be enough to invoke the continuing violation doctrine. If the events giving rise to the purportedly hostile work environment ended more than 300 days before the filing of a claim, that claim is barred. *See, e.g., Engelmann*, 1996 WL 76107, at *15.

Plaintiff filed his verified complaint of discrimination with the EEOC and NYSDHR on April 22, 1996, meaning that for the continuing violation exception to apply his hostile work environment claim must be predicated on discriminatory misconduct alleged within the 300 days immediately prior to his filing. It is.

■ In his amended complaint, plaintiff states that "[t]hroughout [his] period of employment with the Sheriff's Department of Oneida County, New York, [he] was subjected to racial slurs by ... agents, servants and/or employees of the Sheriff's

969 F.2d 560, 565–66 & n. 7 (7th Cir.1992) (same); *Sabree v. United Brotherhood of Carpenters and Joiners*, 921 F.2d 396, 404 (1st Cir.1990) (same); *Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793, 800 (11th Cir.1988).

Department of Oneida County, New York[.]" Amend.Compl. ¶ 19(d). Except for once, however, plaintiff does not specify either who used racial slurs or *when* these slurs were used. Joseph Evans, an inmate at the Oneida County Jail from "August 28th till April 27, 1997"[6] (and thereafter) has testified he heard plaintiff's fellow deputies "[l]ots of times" use "racial slurs"—including the word "nigger"—in reference to plaintiff, other black deputies and inmates. Plf's Aff. in Opposition to Dfts' Mots. for Sum. Judgment at Ex. 8, p. 363, ll. 23–25; p. 392, l. 19 to p. 395, l. 24. Although a marginal call, given Evans' testimony the court will apply the continuing violation doctrine to plaintiff's hostile work environment claim.

■ Plaintiff's disparate treatment claims are distinct from his hostile work environment claim. Almost all fall outside the 300 day statute of and are not sufficiently similar and frequent enough to constitute a single discriminatory practice chargeable to the employer. The continuing violation exception will not apply to them. But another wrinkle arises: although the court cannot examine untimely disparate treatment claims under Title VII, it must address whether they are viable under the NYHRL. "New York courts require the same standard of proof for claims brought under the [NYHRL] as those brought under Title VII," *Tomka*, 66 F.3d at 1304, n. 4, but claims brought under § 296 "are governed by the three-year statute of limitations prescribed by CPLR 214(2)." *Morrison v. New York City Police Dept.*, 214 A.D.2d 394, 394–95,

625 N.Y.S.2d 174, 175 (1st Dep't.1995); *see also Van Zant*, 80 F.3d at 714 (holding same). In sum, the court examines plaintiff's disparate treatment claims whose genesis was in the 300 days prior to April 22, 1996; all of his hostile work environment claims; and his NYHRL claims arising on or before July 3, 1993.

## A. Disparate treatment

Plaintiff's disparate treatment allegations comprise several categories: retaliation; discriminatory application of OCSD's rules regarding sick time; unfair discipline for tardiness; denial of promotion; discriminatory job task assignments; discriminatory discipline (*e.g.*, unfair instigation of Article 75 proceedings); discriminatory investigation; and unfair job performance evaluations. Having considered the record, defendants' motions, and plaintiff's opposition papers, the court holds the only timely disparate treatment claims plaintiff successfully raises are whether he was subjected to discriminatory discipline or retaliation by the instigation of the February 9, 1996 Article 75 proceeding.[7]

### 1. Discriminatory discipline

To maintain a disparate treatment action, a plaintiff must establish a *prima facie* case of discrimination. *See Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997). To establish a *prima facie* case of discriminatory employment discipline, that plaintiff must show: (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment ac-

---

**6.** By his statement, the court infers Evans was an inmate at the facility from August 28, 1996 until April 27, 1997.

**7.** It would be helpful to plaintiff's claims if his memorandum of law addressed the law salient to his claims. For instance, in arguing for the continuing violation exception to apply to all his Title VII claims, plaintiff submits "the continued and specific instances of racial discrimination have continued for so long that it constitutes discriminatory custom, practice and policy and he is thus entitled to present evidence of all the acts even if they

occurred beyond the [ ]300 day statute of limitations." Plf's Mem. of Law at 12. His logic is long on conclusions, but short on facts and law: it does not address *Berry* and its progeny: it does not address which acts are within or outside the 300 day statute of limitations, nor how these acts are sufficiently similar and frequent enough to constitute a single discriminatory practice chargeable to the employer. Plaintiff must offer more than a series of self-serving conclusory statements to survive summary judgment.

tion; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir.1997). The requirements for establishing a *prima facie* case are not onerous. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998).

If a plaintiff demonstrates his *prima facie* case, then the burden shifts to his employer to articulate a legitimate, nondiscriminatory purpose for its adverse employment decisions. *See Austin*, 149 F.3d at 152; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "Any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin*, 149 F.3d at 152. Once the employer satisfies its burden, the plaintiff may yet prevail—but "only if [the] employer's proffered reasons are shown to be a pretext for discrimination." *Id.* To demonstrate pretext, a plaintiff must demonstrate "both that the [proffered] reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 296, n. 2, 58 L.Ed.2d 216 (1978).

Having established the paradigm, the court applies it. Given his modest burden, plaintiff easily meets the first three prongs of the test. The question is whether the Article 75 proceeding instigated on February 9, 1996 occurred under circumstances giving rise to an inference of discrimination. To make such a showing, plaintiff must demonstrate that "similarly situated" employees who do not share plaintiff's protected characteristic were treated prefer-

entially. *See Shumway*, 118 F.3d at 63–64.

Although the ultimate burden in making a *prima facie* case is slight, the issue of whether fellow employees are similarly situated is somewhat strict. In order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it. *See Francis v. Runyon*, 928 F.Supp. 195, 203 (E.D.N.Y.1996) (citation omitted); *see also Shumway*, 118 F.3d at 64 ("[t]o be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare [him]self must be similarly situated in all material respects").

Plaintiff contends at least two other white deputies who allegedly committed crimes were not subjected to Article 75 proceedings, even though he was. First, plaintiff explains that a white deputy, Deputy D'Nardo, was not subjected to an Article 75 proceeding following a jury acquittal on a charge of assault. Second, plaintiff contends a white deputy—identified as "Deputy No. 80"—"was not arrested, charged, or disciplined in any way, shape or form" following his using a service revolver to fire at "civilian pedestrians in a Black neighborhood in Utica, New York."

During the preliminary injunction hearing, Paravati admitted that he had not brought an Article 75 proceeding against D'Nardo, who had been acquitted, but did instigate one against plaintiff, even though the grand jury had refused to indict him. Accordingly, the court finds D'Nardo and plaintiff are similarly situated in all material respects: each allegedly committed a crime, and each was subject to the same disciplinary system, which was governed by Paravati. Given the less than onerous burden plaintiff must meet to prove a *prima facie* case of discriminatory discipline,

the court finds he has met this hurdle. At issue now is whether his employer has articulated a legitimate, nondiscriminatory purpose for its adverse employment decisions. *See Austin,* 149 F.3d at 152.

 Paravati testified he did not bring an Article 75 proceeding against D'Nardo because the deputy did not have an extensive prior disciplinary history, unlike plaintiff. Testimony of Dft. Paravati at Preliminary Injunction Hearing on July 23, 1998 at p. 268, ll. 16–24. In explaining why he brought the proceeding against plaintiff, Paravati claimed he had suspended twelve officers in his tenure—all white except plaintiff—and denied race was a factor in his decision; rather, he simply had better evidence in plaintiff's case. *Id.* at p. 341, l. 8 to p. 342, l. 4. This is a legitimate, nondiscriminatory purpose for bringing the Article 75 proceeding against plaintiff, and the burden shifts to plaintiff to show Paravati's explanations were false and simply pretext for discrimination. Plaintiff, therefore, refers the court to the incident involving Deputy No. 80 to belie Paravati's claim that race was not the real reason behind his decision to bring the proceeding.

The allegations against Deputy No. 80 are extraordinarily disturbing. According to a September 24, 1996 internal memorandum, Chapple informed Paravati that fellow OCSD deputy told him of an incident:

approximately 18 months ago in the city of Utica in which [Deputy No. 80] discharged his then department issue 357 weapon. [Deputy No. 80], Newman and Deputy Michael Bostwick were out drinking one evening. [T]hey left Deshavio's to go on an all night diner[ ] (Michael's) on the corner of South and Mohawk streets in Utica. Some place around Johnson Park they passed some men on bicycles, [Deputy No. 80] took out his department weapon and fired four shots. Newman and Bostick took the weapon away from [Deputy No. 80] and emptied the cartridges on the floor of the car. The next day Newman asked [Deputy No. 80] if he realized what he had done and [Deputy No. 80] said he had but was not worried about it because he knew that the two deputies would not "snitch" on him.

Plf's Aff. in Opposition to Sum. Judgment at Ex. 9.

There is no record of how Paravati reacted to Chapple's memorandum. Although Deputy No. 80's service weapon ultimately was taken from him, plaintiff affirms the deputy "was not arrested, charged, or disciplined in any way, shape, or form" for his actions, and represented at oral argument that the deputy remains employed at the Oneida County Jail.[8] Aff. of James Brown at ¶ 21,

 On the one hand, reasonable factfinders could argue Paravati's race neutral explanation and suspension of eleven white deputies in his tenure proves his instigating the February 9, 1996 Article 75 proceeding against plaintiff was not discriminatory. On the other, reasonable factfinders could decide Paravati's apparent failure to discipline Deputy No. 80 for

---

8. Ten days after the shooting, an inmate, who had identified the car, license plate, and people involved in the shooting, purportedly asked one of the deputies present that evening "why he and the other deputies shot at him and the other people." *Id.* Concerned that there was "a threat to the safety and security by the introduction of contraband into the facility," Chapple drafted his memorandum to Paravati. *Id.*

 Following plaintiff's arrest on driving while intoxicated charges in May 1998, Paravati suspended plaintiff from work and offered the following explanation: "He's suspended from work because I believe he poses a threat to the safety, security of the correctional facility because of his out-of-control behavior pattern." Testimony of Dft. Paravati at Preliminary Injunction Hearing on July 23, 1998 at p. 271, ll. 17–19. Paravati noted that plaintiff's "behavior pattern" included "two other" episodes" as well.

 It is curious, given Chapple's concerns, that Paravati did not at least suspend Deputy No. 80.

his alleged gunplay in a black neighborhood demonstrates he gave D'Nardo preferential treatment because he is white, and discriminated against plaintiff because he is black. Questions of fact preclude summary judgment for Oneida County on plaintiff's discriminatory discipline claim.

### 2. Unlawful retaliation

Title VII makes it unlawful for an employer to retaliate against an employee for opposing an employment practice that violates the Act. 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of unlawful retaliation, plaintiff must show: (1) participation in a protected activity known to defendant; (2) employment action disadvantaging plaintiff; (3) and a causal connection between the protected activity and the adverse employment action. *See Tomka,* 66 F.3d at 1308. Retaliation claims also are analyzed under the *McDonnell Douglas* burden-shifting approach, but there is one caveat: a finding of unlawful retaliation is *not* dependent on the merits of the underlying discrimination complaint. *See Sims v. MME, Paulette Dry Cleaners,* 580 F.Supp. 593, 594 (S.D.N.Y.1984) (*citing EEOC v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66, 70 & n. 6 (S.D.N.Y.1975), *aff'd,* 559 F.2d 1203 (2d Cir.) (table), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)).

■■■ As this court noted in its previous decision, plaintiff indisputably enjoys the constitutional right to file grievances. The right to petition government for redress of grievances, through both judicial and administrative forums, is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). Nor does it matter whether plaintiff's grievance ultimately has merit. To prove that his filing of the notice of claim was a protected activity, he need not establish the claim successfully described conduct amounting to a violation of Title VII. *See Manoharan v. Columbia Univ.*

*College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). He simply must demonstrate he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (internal quotation marks and citation omitted). It is possible, too, for plaintiff to believe that specified conduct amounts to a Title VII violation, even when that conduct ultimately would not qualify as violative under the law. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998). Accordingly, he meets the first prong of the *prima facie* retaliation calculus, as well as the second and third. An Article 75 proceeding surely is an adverse employment action and the temporal proximity of the Article 75 proceeding to plaintiff's filing a notice of claim indicates a causal connection between the protected activity and the adverse employment action.

■■■ Paravati denied retaliation was the motivation for instigating the Article 75 proceeding. Testimony of Dft. Paravati at Preliminary Injunction Hearing on July 23, 1998 at p. 343, ll. 17–21. He further testified that charges had been prepared in March 1995, but were held in abeyance until the grand jury investigated plaintiff's conduct. *Id.* at p. 239, ll. 2–7. The grand jury issued plaintiff a no bill on December 7, 1995, however, and plaintiff's Article 75 proceeding was not instigated until February 9, 1996. Given that plaintiff filed his notice of claim in the interim, reasonable factfinders could decide the instigation of the Article 75 hearing was an act of retaliation: in other words, whether Paravati's explanations articulate a legitimate, non-discriminatory purpose for the timeliness of the Article 75 proceeding is a question of fact. Oneida County's motion for summary judgment on plaintiff's unlawful retaliation claim is denied.

### B. Hostile work environment

The Supreme Court has interpreted Title VII to reach "requiring people to work in a discriminatorily hostile or abusive en-

vironment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the condition of the victim's employment." *Tomka*, 66 F.3d at 1305 (2d Cir.1995) (*quoting Harris*, 510 U.S. at 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295).

■ To prevail on a hostile work environment claim, a plaintiff must demonstrate: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant*, 80 F.3d at 715 (quotation omitted). The conduct alleged must be severe and pervasive enough to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive." *Harris*, 510 U.S. at 22, 114 S.Ct. at 371.

■ "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 23, 114 S.Ct. at 371. As the Supreme Court has stated, " 'mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* at 21, 114 S.Ct. at 370 (quotation omitted). If racist comments, slurs, and jokes are to constitute a hostile work environment, then there must be "more than a few isolated incidents of racial enmity." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). *See also Tomka*, 66 F.3d at 1305 n. 5 ("isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577–78 (2d Cir.1989) (to be actionable, the alleged

incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). In other words, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments," *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994). Whether racial slurs constitute a hostile work environment typically depends upon "the quantity, frequency, and severity" of those slurs, *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994), considered "cumulatively in order to obtain a realistic view of the work environment." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994).

■ Finally, in examining the work environment, courts may consider racial slurs not directed toward a plaintiff. *See Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 673, 675 (7th Cir.1993) (racial epithets need not be directed at plaintiff in order to contribute to hostile work environment). The fact a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment. *See Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir.1997).

■ Plaintiff alleges that prior to April 1994, White referred to him as a "nigger," "lazy nigger," "piece of shit nigger" and "good for nothing nigger." Aff. of James Brown at ¶ 4. Although he alleges no action was taken by his superiors—Hughes, Meyers and Middaugh (then a captain)—about White's derogatory statements, plaintiff concedes he "spoke directly with then-Sheriff Washburn about the matter and he put a stop to the comments by Defendant White." *Id.* Plaintiff makes no other specific allegations that other employees used racial slurs against him, although he does contend: (1) that as recently as the fall of 1998, he was advised by a co-worker that Hughes referred to inmates as "niggers" in a recreation yard confrontation; and (2) he has personally "witnessed members of the SERT Team

making Nazi salutes in the Jail, making and using Nazi slogans and taunts to the inmates within the Jail." *Id.* at ¶¶ 27–28. Additionally, the court also must consider Evans' testimony, discussed *infra*, regarding the use of racial slurs.

 The alleged comments are despicable, odious and offensive, but under the circumstances do not constitute discriminatory behavior that is sufficiently severe or pervasive such that plaintiff's hostile work environment claim can survive summary judgment. First, plaintiff acknowledges that former Sheriff Washburn put an end to White's offensive comments when he complained of them. Second, plaintiff's complaints regarding racial epithets apparently stopped with his communications with Washburn: he does not allege that he complained of the SERT team's Nazi salutes, or any other racial slurs, to any fellow employees or supervisors. Title VII requires plaintiff demonstrate a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *See Van Zant,* 80 F.3d at 715. Plaintiff cannot impute such conduct to his employer if he: (1) never complained of it to his employer; or (2) has not demonstrated his employer—*e.g.,* his supervisor(s)—was aware of the conduct. This logic rings especially true where, as here, plaintiff previously had availed himself of the grievance process successfully.[9] Finally, plaintiff has failed to allege that the remarks unreasonably interfered with his job performance. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 371; *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62–63 (2d Cir.1992). As a result, summary judgment as to plaintiff's hostile work environment claims is appropriate.

### C. NYHRL claims

Again, the statute of limitations for plaintiff's NYHRL claims is three years. *See Van Zant,* 80 F.3d at 714. Clearly plaintiff's discriminatory discrimination and retaliation claims discussed *infra* may violate the NYHRL and subject Oneida County to liability under § 296(1)(a) and Paravati to liability under either § 296(1)(a) or § 296(6).[10] The question is whether any other timely-raised alleged violations of the NYHRL potentially may impute additional liability.

 For the reasons addressed *infra,* plaintiff has not presented a hostile work environment claim under the NYHRL. His denial of promotion allegation fails because he has not alleged specific instances where he applied for and was denied any job advancements. Assuming *arguendo* the following fall within the statute of limitations, his discriminatory investigation, unfair job performance evaluations and unfair discipline for tardiness claims fail because he has not shown similarly situated white deputies have received preferential treatment in these matters. Absent this showing, he cannot make a *prima facie* case of discrimination.

 Plaintiff also makes a claim regarding discriminatory application of the rules regarding sick time. One day in May 1994 he called in sick to work. Although he had accumulated more than 200 hours worth of sick time, Chapple and Lamanto stopped by his residence and "rang [his] doorbell to verify his whereabouts, which action was not a normal procedure according to the rules and regulations of [the OCSD] and not followed

9. The court is not suggesting that before a plaintiff can pursue a hostile work environment claim he must demonstrate that he complained of offensive conduct to his employer. In situations where the employer was the offender, it seemingly would be ludicrous to require a plaintiff to lodge a complaint with his employer. Instead, what is of capital importance is demonstrating that an employer is aware of the conduct comprising a hostile

work environment claim. Typically, though, it will be the plaintiff who raises the red flag to the employer.

10. The court finds that as Lisi had no authority to instigate the February 9, 1996 Article 75 proceeding against plaintiff, he cannot be held liable under a theory of § 296(6) liability.

with respect to white officers." Plf's Amend.Compl. at ¶ 19(a). Plaintiff continues that on another occasion, he was "required to produce a doctor's excuse after only one day although [his] union contract states that a doctor's excuse is only required after three days of consecutive sick leave." *Id.* Finally, plaintiff adds that when he "attempted to return to work, he was turned away from his post and Defendant Sergeant Meyers attempted to dock [his] pay for the two days [he] showed up for work and was asked to leave." *Id.*

■ As to his "sick call verification claim," even if true it fails because he has not shown how it is an adverse employment action, which is an indispensable element to a *prima facie* case of discrimination.[11] *See Shumway,* 118 F.3d at 63. Nor has plaintiff demonstrated how requiring a doctor's excuse—even in violation of a union contract—and "attempt[ing]" to dock his pay and "ask[ing]" him to leave amount to adverse employment actions. If his pay *was* docked and he *was* forced to leave work—while similarly situated white deputies never faced this punishment, then his claim would be different. Those are not his allegations; his instant claim is without merit.

■ Plaintiff also contends he was given discriminatory job task assignments. "Black officers," he claims, "were constantly placed in the bad blocks where the minority inmates were housed because they were supposedly better able to 'deal with your own people.'" Aff. of James Brown at ¶ 29. Discriminatory job assignments to a certain department or work area are forbidden under Title VII, *see Wright v. Olin Corp.,* 697 F.2d 1172, 1179–81 (4th Cir.1982), even if such assignments do not harm a plaintiff economically.[12] *See Rodriguez v. Board of Education,* 620 F.2d 362, 366 (2d Cir.1980); *Swint v. Pullman–Standard,* 539 F.2d 77, 92 (5th Cir.1976). To establish a *prima facie* case of discrimination in job assignments, plaintiff must establish: (1) that he belongs to a protected racial group; (2) that he was given specific job assignments; and (3) that the circumstances surrounding the job assignments give rise to an inference of discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ Although plaintiff makes the claim, he does not develop the record and cannot prove a *prima facie* case. His affidavit and opposing papers do not specify what discriminatory job assignments he was given, *nor does his affidavit even allege that he has been "constantly placed in the bad blocks,"* which, given the law as the court reads it, would be germane to him proving a *prima facie* case of discrimination. Again, plaintiff is reminded of this fundamental, irrevocable, universal and timeless Title VII legal tenet: the ultimate burden of persuading the trier of fact that a defendant intentionally discriminated against him remains *at all times* with him. *See Board of Trustees of Keene State College,* 439 U.S. at 25, n. 2, 99 S.Ct. at 296, n. 2. Allegations, sans evidence, do not cut muster.

Other than his discriminatory discipline and retaliation claims, all of plaintiff's other NYHRL claims are without merit and amenable to summary judgment.

## V. Plaintiff's Section 1983 Claims

Section 1983 permits plaintiff to file suit against only those individuals, acting under

---

11. Although plaintiff concludes that the verification procedure was "not followed with respect to white officers," he produces no evidence to validate his claim. (Indeed, evidence in the record belies his allegation: Lamanto testified that he had once been visited by a sergeant on a day he called in sick. *See* Dft Lamanto's Mem. of Law at Ex. B, pp. 9–10). Accordingly, even if plaintiff could show the visit was an adverse employment action, he has not shown that similarly situated white deputies were given preferential treatment.

12. Again, an analysis under the NYHRL is identical to one under Title VII. *See Tomka,* 66 F.3d at 1304, n. 4.

color of state law, who caused him to be "depriv[ed] of any right, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994) (citations omitted). *C.f. Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995) (to state a valid § 1983 claim, plaintiff must allege state action and deprivation of right, privilege or immunity secured by Constitution or federal law). There is no dispute that defendants acted under color of New York state law. The only unresolved question is whether they acted in a manner that deprived plaintiff of any "rights, privileges or immunities secured by the United States Constitution." 42 U.S.C. § 1983.

Plaintiff alleges a series of § 1983 violations, most of which pertain to his arrest and attempted prosecution on the aforementioned possession of a forged instrument charge, and the subsequent decision to discipline him through the Article 75 proceeding. Specifically, he charges: (1) Lisi lacked probable cause in arresting him and therefore violated his Fourth Amendment rights; (2) "defendants'" motive for attempting to prosecute plaintiff was actuated by race and therefore in violation of the Equal Protection Clause of the Fourteenth Amendment; (3) "defendants" violated his right to due process under the Fourteenth Amendment through implementing the contested Article 75 proceeding; (4) "defendant's" violated his Fourteenth Amendment right to due process by instituting that proceeding in bad faith, "impair[ing] Plaintiff's interest in his good name, reputation, honor and integrity"; and (5) "defendants" retaliated against him because he exercised his First Amendment

rights.[13] Oneida County, he further alleges, has a *de facto* policy of punishing, retaliating and discriminating against minority members of the OCSD in the "terms, privileges and conditions of their employment." Amend.Compl. at ¶ 35.

■ Aside from plaintiff's retaliation claim, none of these allegations have merit. There is a surfeit of evidence that Lisi had probable cause to arrest plaintiff for possession of a forged instrument in violation of New York Penal Law § 170.25. In 1994, Troy Winters, an inmate where plaintiff worked, claimed he had sold plaintiff a car but had not been paid in full. Former Sheriff Washburn directed Lisi to investigate the matter, so Lisi asked plaintiff if he owed Winters any money. Although he conceded a transaction had taken place, plaintiff purportedly denied owing Winters anything. In early 1995, Middaugh, who had just been elected sheriff, asked Lisi to investigate the matter again. Lisi reiterated his questions to plaintiff, and plaintiff reiterated he did not owe Winters any money. Lisi ended his investigation. *See* Aff. of Joseph Lisi at ¶¶ 3, 6, 7.

Winters, however, then made a written complaint that his vehicle had been transferred from him to a new purchaser by means of a forged Department of Motor Vehicle document. Lisi initiated a criminal investigation in cooperation with Investigator John Abounader of the New York State Department of Motor Vehicles. Their investigation yielded the following: (1) that an MV–50 New York State Department of Motor Vehicles Retail Certificate of Sale No. 7130738 indicated that Empire Auto, owned by Don Malick, Sr., had acquired a 1986 Ford from Daniel Greenwell and sold it to Winters; (2) Malick submitted a sworn affidavit affirming that this certificate bore his signature and he had made the sale to Winters; (3) Malick, after having been shown an MV–50

---

**13.** Plaintiff contends in his memorandum of law that Lisi violated his Fifth Amendment rights when he never gave him a Miranda warning. However, because plaintiff never raised that claim in his amended complaint, the court cannot address it.

bearing the number 1292828, which purportedly showed the sale of Winters' newly acquired vehicle by Malick's dealership to Rosalie Gryszkiewicz, affirmed not only that he did not sell the vehicle to her, but also that the signature allegedly bearing his name was a forgery and made without his knowledge or consent; (4) Malick also affirmed that a Vehicle Registration Title Application Batch Filed numbered 41018–660 in Gryszkiewicz's name bore his forged signature; (5) Gryszkiewicz affirmed she had purchased the disputed automobile from plaintiff for $850, and that he gave her the forms containing the forged signatures (which she ultimately used to register this vehicle). *See Id.* at ¶¶ 9, 11, Exs. B–G.

The investigators spoke with Alvin Smith, operator of A & C Auto Sales, who indicated in a voluntary sworn statement that plaintiff had requested him to fill out an MV–50 in the name of Empire Auto. Smith did, but swore he did not sign the dealer's name on the signature line. He identified the MV–50 containing the forged signature as the form he had filled out for plaintiff. With the investigation completed, Lisi believed there was sufficient evidence to believe that plaintiff had possessed a forged instrument when he sold the disputed car to Gryszkiewicz. *See Id.* at ¶ 11. The court concurs. Plaintiff's Fourth Amendment claim is dismissed.

■ Given that Lisi had probable cause to arrest plaintiff, "defendants"—whoever they are—enjoyed the right to prosecute him. Nor has plaintiff shown any evidence his prosecution was actuated by impermissible discrimination. A grand jury refused to indict him, but this inference alone hardly warrants a conclusion that discrimination motivated his prosecution. His equal protection claim is dismissed.

■ Plaintiff's claim that "defendants" violated his Fourteenth Amendment due process rights by instituting the Article 75 proceeding in bad faith, "impair[ing] Plaintiff's interest in his good name, reputation, honor and integrity" amounts to a constitutional claim for defamation. It is not actionable. The Supreme Court has declined to include state tort-law as a basis to actions under federal civil rights statutes based on an asserted violation of the Fourteenth Amendment. *See generally Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding plaintiff, whose name and photograph impermissibly appeared on flyer captioned "Active Shoplifters" distributed among merchants by local police, failed to allege deprivation of liberty or property interest sufficient to invoke protection of Due Process Clause of Fourteenth Amendment).

■ Plaintiff's claim defendants retaliated against him with the Article 75 proceeding may have merit. Although plaintiff refers to "defendants"—a term he often invokes indiscriminately—it appears he means Paravati, who was responsible for initiating the proceeding against him.[14] To state a retaliation claim under § 1983, plaintiff must show the conduct at issue was constitutionally protected and that it must have been "a substantial or motivating factor" in the decision to discipline him. *Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Retaliation claims may be fabricated easily, so plaintiff bears a heightened burden of proof. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). If plaintiff meets this heightened standard, Paravati still may prevail if he demonstrates by a preponderance of the evidence that he would have taken

---

14. Plaintiff has not demonstrated any evidence that Middaugh was responsible for instigating the Article 75 proceeding against him, and Middaugh's deposition testimony contradicts any such claim. *See* Plf's Aff. in Opposition to Dfts' Mots. for Sum. Judgment at Ex.1, p. 153, II. 1–3. Absent some personal involvement by Middaugh in the alleged deprivation of plaintiff's constitutional rights, he cannot be held liable under § 1983. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987).

the same action against plaintiff "even in the absence of the protected conduct." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (*citing Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576).

■ Here plaintiff has met his burden. As the court discussed earlier, filing a notice of claim is a constitutionally protected activity under the First Amendment. Reasonable factfinders could differ, based upon the temporal proximity of the instigation of the proceeding, as to whether Paravati's decision was motivated by retaliation. Whether Paravati has demonstrated by a preponderance of the evidence that he would have taken the same action against plaintiff "even in the absence of the protected conduct" is a question of fact.

■ Paravati maintains he is entitled to qualified immunity, but whether he is so entitled also is a question of fact. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir.1986) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The contours of the right that defendants are alleged to have violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Maguire v. Coughlin*, 901 F.Supp. 101, 106 (N.D.N.Y. 1995) (McAvoy, C.J.) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). In determining whether a statutory or constitutional right was clearly established, three factors come into play: (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *See Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). If plaintiff's retaliation allegations ring true, Paravati surely would know his commencing the Article 75 proceeding was unlawful.

■ There is a caveat, however: Paravati, if liable, cannot be liable in his official capacity. To the extent a state official is sued for damages in his official capacity, the suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See, e.g., Will v. Michigan Department of State Police*, 491 U.S. 58, 64, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (neither a state agency nor a state official sued in his official capacity is a "person" within the meaning of § 1983); *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991). *See also HR v. Orleans County Sheriff's Dept.*, No. Civ.A. 2:97–CV–052, 1998 WL 560036, at *3 (D.Vt. Jul.28, 1998) (Eleventh Amendment prohibits sheriff and deputy defendants from suit in their official capacities). With any claim brought against him in his individual capacity, however, the state official has no Eleventh Amendment immunity. *See Hafer*, 502 U.S. at 30, 112 S.Ct. at 365.

■ Finally, the court turns to plaintiff's claim against Oneida County. Oneida County argues plaintiff has alleged no county policy that could subject it to § 1983 liability. The court agrees. A § 1983 plaintiff cannot sustain a claim against a municipality absent proof of a municipal policy. *See Liffiton v. Keuker*, 850 F.2d 73, 76 (2d Cir.1988). Plaintiff is long on conclusory statements, but has offered absolutely no evidence of a county policy or practice that caused the alleged deprivation of his civil rights. Individual prosecutorial actions, such as the initiation of an Article 75 proceeding, are not poli-

cies of the county. *See Baez v. Hennessy,* 853 F.2d 73, 77 (2d Cir.1988), *cert. denied,* 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989).

All of plaintiff's § 1983 claims, save his claim against Paravati for retaliation, are without merit and dismissed.

## VI. Plaintiff's Section 1981 Claims

Under 42 U.S.C. § 1981:

all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exaction of every kind, and to no other.

To state a § 1981 claim, plaintiff must allege facts to establish: (1) membership in a racial minority group; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). Conclusory allegations do not support a § 1981 claim. *See Yusuf v. Vassar College,* 35 F.3d 709, 713–14 (2d Cir.1994).

In its general application, § 1981 has been construed as a prohibition against racial discrimination. *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 608–10, 107 S.Ct. 2022, 2025–27, 95 L.Ed.2d 582 (1987). Any discrimination must have been intentional and purposeful and the plaintiff's race must have been the motivating factor behind the defendant's discriminatory acts. *See Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988). Naked assertions by a plaintiff that race

was a motivating factor—without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race—are too conclusory to allege a § 1981 violation. *Yusuf v. Vassar College,* 827 F.Supp. 952, 955 (S.D.N.Y.1993), *aff'd in part and rev'd in part,* 35 F.3d 709 (2d Cir.1994).

Plaintiff's § 1981 charge is that "[d]efendants deprived [him] of his right to make and enforce contracts and to the full and equal benefit of all regulations and laws and proceedings for the security of [his] person and property[.]" Amend.Compl. at ¶ 40. The court has found already the only defendant who may have violated plaintiff's rights based upon a theory of race discrimination is Paravati. Accordingly, he is the only defendant who potentially may be held liable under this statute.[15] Plaintiff's other § 1981 claims are meritless and amenable to summary judgment.

## VII. Plaintiff's Section 1982 Claims

Generally speaking, 42 U.S.C. § 1982 prohibits private racial discrimination in the sale or rental of real or personal property. See 42 U.S.C. § 1982 ("All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property"). The record is devoid of any evidence that would allow plaintiff to pursue any § 1982 action. It is dismissed.

## VIII. Plaintiff's Section 1985 and 1986 claims

The claims plaintiff brings under §§ 1985 and 1986 are likewise meritless. To establish a viable claim under § 1985(3), which the court assumes is the basis for his claims, plaintiff must allege and prove four things: (1) a conspiracy;

---

**15.** Again, any finding of liability against this defendant would be in his individual capacity only.

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See United Bhd. of Carpenters and Joiners v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983). Any conspiracy must be motivated by " 'some racial or perhaps otherwise class-based invidious discriminatory animus behind the conspirators' action.' " *Mian*, 7 F.3d at 1088 (*quoting United Bhd. of Carpenters*, 463 U.S. at 829, 103 S.Ct. at 3356). Section 1985(3) should not be interpreted as a "general federal tort law." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

> Plaintiff submits:
> The defendants have clearly conspired in their attempt to injure the Plaintiff because he has sought to enforce his rights to be free from a work environment which is alternatively hostile and retaliatory. Documentary evidence demonstrates the concerted efforts of Defendants Lisi, Paravati, Chappel [sic], and others to trump up the charges against the Plaintiff and to try and discredit him or punish him after he filed suit. The proof in this also case [sic] shows that the Defendants sought to impede, obstruct, and defeat the due course of justice[,] intending to deny the plaintiff equal protection of the laws by subjecting him to different standards of performance and enforcement than white employees.

Plf's Mem. of Law at 9.

In his argument, plaintiff has done everything but articulate what specific evidence demonstrates a conspiracy under § 1985(3). "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987); *see also Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir.1990), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991) (complaints based on violation of constitutional right must contain more than conclusory allegation to avoid dismissal); *Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir.1994) (holding same result). His § 1985 claims are dismissed.

Section 1986, meanwhile, establishes liability as to those persons who fail to prevent a conspiracy to violate an individual's civil rights. As plaintiff has not set forth sufficient allegations of a conspiracy against defendants, he states no § 1986 claim against them. *See Koch v. Mirza*, 869 F.Supp. 1031, 1039 (W.D.N.Y.1994). These claims are dismissed.

## IX. Plaintiff's State Court Claims

 Plaintiff raises a host of state court claims: false arrest, false imprisonment, malicious prosecution, slander, intentional infliction of emotional distress, *prima facie* tort, abuse of process, negligence and gross negligence. Noting that under New York County Law § 52(1) plaintiff had one year and ninety days to bring an action against the county, and that under New York General Municipal Law § 50–e(1)(a) he had to file a notice of claim against the county within ninety days, Judge Tenny of the Supreme Court for the State of New York, Oneida, found that the only timely claims plaintiff had brought against Oneida County were for malicious prosecution, false arrest and abuse of process. Aff. of James O'Shea at Ex. D. Plaintiff's employment discrimination claims were dismissed as untimely. *Id.* As Oneida County notes, failure to comply with the New York General Municipal Law regarding timely service of the notice of claim and its related pleading requirement is a jurisdictional rather than a procedural defect. *See Mroz v. City of Tonawanda*, 999 F.Supp. 436, 453

(W.D.N.Y.1998). Plaintiff's common law state tort claims against Oneida County—with the exception of the malicious prosecution, false arrest and abuse of process claims—are therefore untimely and must be denied. As to these latter three claims, for reasons largely discussed *infra* (*e.g.,* because ample probable cause existed to arrest plaintiff), they are meritless.

Although plaintiff alleges common law state tort claims against the individual defendants, he refers to neither case law nor facts in the record to prove these allegations. The court finds they likewise are feckless and must be dismissed.

## X. The "John Doe" Defendants

Although this case has been pending for more than two years, plaintiff has not identified the "John Doe" defendants at the OCSD. Given that the time to amend his complaint has passed, this court dismisses plaintiff's claims against the "John Doe" defendants for failure to prosecute. *See* Local Rule 41.2(a) of the Northern District of New York. *See also Colle v. Brazos County,* 981 F.2d 237, 243 (5th Cir.1993) ("failure to further identify or serve the 'unnamed employees' after three years ... is sufficient to warrant dismissal [under Fed.R.Civ.P. 41(b)].")

### CONCLUSION

After careful review of the record, the court **DENIES** plaintiff's motion to supplement his complaint. The court **GRANTS** summary judgment to defendants Middaugh, Meyers, Chapple, Hughes, Lamanto, White and Lisi. The court **DISMISSES** the unamed John Doe defendants from the suit. The court **GRANTS** in part and **DENIES** in part summary judgment to defendants Oneida County and Paravati. Plaintiff's sole remaining claims against Oneida County are his Title VII and NYHRL claims for discriminatory discipline and retaliation regarding the instigation of the February 9, 1996 Article 75 proceeding; plaintiff's sole remaining claims against Paravati are his NYHRL claims for discriminatory discipline and retaliation regarding the instigation of the February 9, 1996 Article 75 proceeding, as well as the related § 1983 retaliation and § 1981 discrimination claims. All other claims plaintiff raises are **DISMISSED.**

**IT IS SO ORDERED.**